case of this early morning session, In Re Yellow Corporation, appellate number 25-1421. Good morning, Judge Schwartz, and may it please the court. Derek Schaefer here on behalf of Appellants to Argue, the SFA funds regulation issue. My friend, Mr. Hicks, will be addressing the contract issue separately. I will endeavor, with the court's permission, to reserve four minutes of my time for a vote. And that will be granted. Your Honors, this appeal is about following the chain of command and adhering to Congress's statutory prescription in the face of a purportedly reasonable agency regulation that palpably conflicts. Otherwise, an agency will have done what it cannot do, claiming statutory authorization that Congress has withheld in legislating where Congress has not. But in this case, hasn't Congress pretty clearly legislated permission to the BPGC under Section 1302, 1432, meaning both from ERISA and from the ARPA? Judge Schwartz, we are not challenging those delegations of interstitial authority for the agency to regulate reasonably within the lines of what Congress has laid down in their on-point prescription from Congress. And I'd focus the court on 20... You said that you're not contesting there's clear authority to do it, but it flies in the face of other clear authority to do it? That's... Forgive me for being unartful if that's what I said, Judge Schwartz. What I meant is they have authority to regulate reasonably between the lines of the statute, not to contradict the statutes. How do they contradict the statute? I'm sorry? How do they contradict the statute? 1393, Judge Ambrose, Congress clearly and expressly prescribed how unfunded vested benefits are meant to be calculated for purposes of determining an employer's withdrawal liability. How is that done? Plan assets must be deducted from non-profitable benefits. And that ties in with 29 U.S.C. Section 1391A, which is providing employers statutorily vested rights. Here's what 1391A says. The amount of the unfunded vested benefits allocable to an employer that withdraws from a plan shall be determined in accordance with the ensuing subsections, all of which revolve around unfunded vested benefits. And there are choices of... What's the purpose of the regulation? Well, I think... Are you talking about both phase in or the withdrawal or just one at the moment? I think that the one is derivative of the other. So I think that the no receivables regulation is basically there to aid implementation of the phase in regulation so that you don't have a run on withdrawals just as the first payment is coming. But between that period of time when the application has been granted and the payments have been made... I think Congress was right to guard against that, right? Well, Judge Ambrose, I would say this. I don't think Congress specifically addressed any different treatment of SFA funds as compared to other plan assets that are available. Right in the statute, the ARPA that in part allowed these funds to be issued specifically told the PBGC to come up with regulations on the withdrawal liability point specifically. Relating to withdrawal liability, that's true, Judge Hortz. But I don't think, for instance, that the agency could have said that now non-forfeitable... That rather forfeitable benefits, unvested benefits would help in the form... Well, I know what we're talking about. Go ahead, Judge. What do you do with 29 U.S.C.A. 1002M that deals with the plan assets? Plan assets defined by regulation as the secretary may prescribe. Well, I do think that you have it from Congress specifically in 1432 that these are plan assets, Judge Montgomery. I mean, that is laid down specifically in L that they are to be segregated from other plan assets. So that's clear treatment of these funds as plan assets. And beyond that, it specifies that these shall be available or may be available to make benefit payments. So they're plan assets in exactly that substantive sense, that these are funds that are meant to be available to pay vested benefits. So to take them out of the calculation of what constitute the unfunded vested benefits is, in our view, to contravene the will of Congress. Judge Ambrose, if Congress had wanted to address this and said we're concerned about employers' incentives to withdraw too soon, I think you would have expected Congress to address the bankruptcy side. They would have said there's a different policy concern when we're talking about bankruptcy and involuntary withdrawals because you don't have the same about incentives. Congress seemed to draw lines between what the PVGC could do and couldn't do. And I think Judge Schwartz began noting 1432 says includes conditions relating to the allocation of plan assets and withdrawal liability. At the same time, they set demarcations as to what it cannot do. It cannot regulate plan personnel, plan governance, the funding and accounting of plans in endangered or critical status. So where did they miss the boat? Where did Congress miss the boat? Did the PVGC miss the boat? Well, I don't think Congress did because I think Congress could safely assume that you wouldn't have an agency under auspices of reasonable regulation changing the statutory formula under Section 1393. I don't think that you can assume that Congress was assuming that the agency would override, you know, related congressional prescription by the way that had been in place since 1980. That's the statutory law that the agency's bound to follow. And in progenitors of the major questions cases, cases like MCI v. AT&T, Utility Irregulatory Group v. EPA, the Supreme Court had been clear that agencies that have reasonable regulatory authority do not have authority that allows them to upend on-point statutory prescription. If major questions was your major point, why was it not at the beginning of your brief? Well, I don't know that it's our major point. I think it's a tougher issue for the court to deal with as opposed to just enforcing the statutory prescription from Congress. I think the statute is clear. Major questions is a statutory interpretation tool. We don't need to turn to that if the statute's clear, correct? That's how I see it, Judge Schwartz. And I think that that's how the Supreme Court was doing things in these cases before it had the major questions doctrine as kind of a companion or an evolution of these cases that are about how do we read statutes relative to regulations. And just for MCI... Doesn't the statute give the plan authority to, not the plan, I'm sorry, the PBGC to do, make actuarial assumptions and other things when they're calculating? And can it be fair to look at this more as a direction on how to value an asset? I don't think it is, Judge Schwartz. If it is. If it is. That is within their authority as part of actuarial sort of authority to figure out how to value things. Am I right? I'm going to give you a yes and a no. A yes that they absolutely have that authority to tweak actuarial assumptions and to specify, for instance, what should those assumptions be as they've done under other regulations. We're not questioning that. What you have here is a categorical exclusion of something that is unquestionably, I don't think the other side denies, that SFA funds are plan assets that are thereby designed to fund benefits. It's not categorically excluded. It's just phased in over time, depending on when the withdrawal happens. Well, I don't think they deny that they would have the authority, part and parcel of the phase-in authority, to say that it is excluded on day one or as of the application being granted. It is categorically excluded from consideration, even though any accountant and any actuarial assumption would say billions of dollars in funds need to be accounted for. Only as a receivable for the time being, but once it's in the account, isn't your real fight on the phase-in part? Because we're talking usually just a matter of weeks between application and release of funds, as I understand, at least the one example in the record. Well, but to take the disconnect, if we may, between the congressional prescription and what the agency does with the phase-in regulations, the statute is equally clear that the funds are paid lump sum in a single payment. So that's the reality that is dictated by Congress. And then you have an agency saying, notwithstanding that, we're going to treat those funds as though they're not there in large part for a period of years. And that, I think, just underlines the disconnect. And I would emphasize, when we're talking about withdrawal liability, we are talking about congressional prescription relative to employers. You argue that the regulations are conditions on the plans. I'm trying to understand how any of the regulations would not be conditions on the employers under your reasoning. Well, let me explain that, Judge Montgomery-Reeves. When we look at 1391, that is a shall command of Congress that is specifically directed at employers and their withdrawal liabilities and what they will need to pay in. The plans have to calculate the withdrawal liability. That is absolutely true, but it is a ministerial function. And Congress, through force of law, is saying, through the statute, what employers will owe. So if an agency or if a plan strays from that, there are rights that the employer has to take that up via an arbitration. Via these regulations that purport to have force of law relative to employers, essentially, it's been told to employers that your withdrawal liability is different from what it would which means, bottom line, you were paying much more money into a supposedly underfunded plan. That is operating against the employer directly. Are you saying the regulations increase the amount of your withdrawal liability, or do they just simply hold to what it was before the ARPA funds came in? Judge Ambrose, I think that they are increasing the withdrawal liability relative to what you have from the statute, relative to what you have with SFA funds being made available. And I'd say the same if the argument went, well, now employers are going to be treated as needing to contribute more to insolvent plans that are categorized as endangered or in critical status. If you said, we're going to disregard the SFA funds for that purpose, which presumably would be no less available to the agency, you would be making employers pay more into endangered plans and disregarding the fact that the SFA funds are there for the express purpose of paying benefits. So you would be treating plans as underfunded. They can only pay benefits or expenses, right? That's correct. I want to say that is the bankruptcy judge's theory of it. It's a made statement in the statute. They're available for those purposes explicitly. It is not a specification that they're not available for any other purpose. But wouldn't that just be contrary to the whole purpose of these monies was to ensure that plan beneficiaries are benefited, not the employers? And also counter to the argument you previously made this morning. Well, I don't think so, Judge Ambrose. What I mean to say is you have clear... Better answer her question. Okay. Sorry. What I mean to say is this. I think that you do not have the same clarity in that sub-provision as you do with respect to employer's withdrawal liability, shall command that it shall be calculated per the formula and the specification that plan assets are the core component of that calculation. And I think even... For Judge Ambrose's question. And for Judge Ambrose, I would say this. The fact that the statute says these assets are available to pay benefits, I think tells you as an inexorable corollary of that, that in Congress's view, these count as plan assets in an equation that's trying to determine, after all, is a plan underfunded? It is a counterfactual or counter statutory assumption to then pass a regulation that says disregard those funds that are there for the express purpose of paying these... These regulations had notice and comment that they did not... They did. And they even had a listening tour around the country, which is sometimes done in order to get various views in terms of setting the balance correctly or what they think is correct. Well, that's true. I think it was a little bit of a deviation from what I think of normal notice and comment because of the listening tour aspect. But you're absolutely right, Judge Ambrose. There was that listening tour. Did you folks participate in any of that and lodge any comments during the rulemaking process? Because if you didn't, maybe we can't consider your objections now if you didn't object during rulemaking. Well, I think we can rely upon the comments that were made and addressed by the agency. And in particular, they wound up making this, I think, concededly unsupported assumption about the extent to which employers would be withdrawing early. You're saying that even though none of the plans involved in this matter participated in the notice and comment process simply because others articulated similar positions, you're allowed to now object? I think that's right, Your Honor. Do you have a case law that says that? I don't know that I have it in the brief, but I do have it available if the court would like to see it cited. Because the agency's obligation is to engage in reasoned decision-making and to refer it to the court. And so they purported to justify these regulations. We don't think they did that. But I also emphasize that the statutory conflict is one that this court, I think, in terms of chain of command and who's the captain, it's Congress. It's Congress that's the captain. And if the agency has departed from that, I think it decides the case, Your Honors. Two questions for you about the assumption you just mentioned. Why isn't that the type of predictive judgment that we should rely on the agency for, who may or may not withdraw? And then my second question was, why doesn't that just make common sense and that support the PBGC's position?  So I think that Congress obviously trumps to the extent that they've arrived at their policy judgment. And I think if Congress was wrestling with this question of should SFA funds be treated as something other than a planned asset, I think they would have addressed the bankruptcy context and said, then we should have different rules because we don't have the same incentives operating. And we have concerns that you're going to have unfunded plans that don't have SFA funds. The whole point of these funds were to avoid these entities going belly up, including the employers who participated. So it's not surprising that the bankruptcy context wasn't specifically identified. And in addition, there probably is no difference between a voluntary withdrawal and an involuntary withdrawal when the whole concept is, do we have the funds to pay the employees? Well, Judge Fortz, I agree with some of that. Here's what I disagree with. We're talking about the employer who's gone bankrupt, not the plan that's gone bankrupt. Understood, but I understand that. But that's the whole point. They were trying to keep everything afloat. If the employers are going bankrupt, then there's not money to put in. And then the plan has its problems. So I don't understand this. You know, they should have spoken about bankruptcy so specifically. Here's all I need. That employers don't have the same voluntary decision making. Am I going to withdraw from a multi-employer plan when they go bankrupt and they're just not able to pay out monies anymore? You don't have the election of an employer for reasons specific to the multi-employer plan that I'm going to choose to withdraw early. And it's a calculated decision. And to answer the other aspect of your question, Judge Montgomery-Reeves, I just think that we're talking about unfunded plans. And some of those unfunded plans don't have SFA funds at all. And if you have an employer in the position of yellow that's being made to pay more money gratuitously as a windfall into a plan that's fully funded once you consider the SFA funds, you will have other plans that do not have the SFA funds, that are not fully funded, that will look to an employer like yellow for a greater contribution. And that money will not be there because we're talking about a very limited pie in the context of a bankruptcy. That's probably a good segue to how we calculate then. Correct? Yes. So maybe that's the next person coming up. Okay. Thank you, Your Honors. Okay. Let's see our rebuttal. Morning. Thank you, Your Honor. And may it please the court, George Hicks for the Debtors Yellow Corporation, and on behalf of all appellants, I'm going to address the separate dispute over withdrawal liability with the New York and Western Pennsylvania Teamsters. And I've reserved two minutes for rebuttal. What did you agree with initially to pay? I'm sorry, Your Honor? What did yellow agree with initially to pay? I believe that back in 2013, what yellow agreed to was to be under Schedule G, which was a deviation from, it was an amendment to the plan, but that is what, it was a 25% contribution that would be required to be made under that plan. So that's what the agreement was. That was the benefit it got. I'm sorry again? That was the benefit it got. I believe the benefit was at the time that it would be allowed to contribute to the plan that it would not go to immediate... They negotiated a separate deal with, in 2013. And what was the benefit it got and what was the consequence if it didn't comply? I believe, Your Honor, that at the time the benefit was that it would not have immediate withdrawal liability at that time. It also got a reduced rate from what it had been made to before, a real-time contribution. And it was, the contract said that, however, if you withdraw, we're going to use the rate you're obligated to, correct? Your Honor, we don't dispute that any of that happens. But what we are arguing is that, you know, if there is an agreement like that, that it still has to be approved by the PBGC because it is a deviation from the presumptive method that is set out in the statute. And it's very clear in the statute that when you have, quote, any alternative, any other alternative method for calculating withdrawal liability, you must obtain PBGC's approval. How is that an alternative method? All it is is changing one of the numbers that the parties agree to, to make up for the kind of largesse that the plan gave. I'm not sure there's a different calculation method. Well, Your Honor, I guess I would respectfully disagree when the statute says that the presumptive method, which is what the plan is claiming to have been used, requires using, quote, the contributions required to be made under the plan. Under this plan, what was required to be made were contributions at the 25% level. And yet they're using 100% contributions when calculating withdrawal liability. I mean, I don't think that's any different than if I have a recipe for a chocolate cake that says flour, water, eggs, and cocoa, and then I use vanilla instead of cocoa, I don't have a chocolate cake anymore. I didn't follow the method for creating that. It doesn't matter what the input changes. That's the method. And when the statute says, quote, any other alternative method, any is a capacious word. And it all holds together. I mean, you can do these things. A plan can do these things. It simply has to get PBGC. But you were taking the benefit that you got from the 2013 agreement, and you weren't complaining in 2014 or 2015 and thereafter until you went into bankruptcy that somehow this was not allowed, right? Well, your honor, I guess I take a little bit of issue with the idea that it's a purely one-sided benefit here. I mean, you wouldn't have done the deal in 2013 if you didn't get some benefit, correct? Presumably not. But all of that is, I think, a separate contract issue. I don't think it addresses the statutory question we have here. And it's that it holds together if you have the PBGC approval requirement, which is that plans can do these. But you didn't say in 2013 or 2014 that we should get PBGC approval. If you're on the other side, basically what you're saying is you're taking a head-to-head win-tails-you-lose argument. And courts have dealt with this before, like the Seventh Circuit and Artistic Carton, in which they say, OK, there's a difference between an elaboration and an ovation. In other words, an elaboration is you have some type of amendment, but you're not completely doing things where an ovation means you're stepping into the shoes of somebody else. And this is an elaboration. This is not an ovation. How would you distinguish Artistic Carton from this case and the other cases that follow Artistic Carton? You're right. I would distinguish Artistic Carton in many ways. First of all, this ovation elaboration, I mean, all of that was in dicta in that portion of Artistic Carton. But there's nothing in the statute- There's other cases that have followed that, correct? Uh, not that I've seen my friends on the other side cite. I have not seen anything that cites Artistic Carton for this ovation elaboration requirement. And I think- But the Seventh Circuit in another decision by Judge Cuddy, I thought, did. Uh, if that's the decision that I think my friends have cited saying is a completely different method, there's nothing. I mean, that case did not address what a completely different method is. And that's not what the statute requires. The statute requires any other alternative method. Let's assume we follow that. Why is this not an elaboration, but rather a, in effect, an ovation? Well, Your Honor, accepting the premise that there actually is a statute of distinction between the two, which I don't think there is. And I don't think Artistic Carton supports because it was also dealing with the direct attribution method. It wasn't dealing with the presumptive method. But even taking that, I think that when you have the statute saying that, quote, the proportional share of allocable UVBs is, quote, the contributions required to be made under the plan, and then you use something that is not the contributions required to be made, I don't think it gets any more stark that you have deviated from the statute. If that's not something that requires PVGC approval, I'm not sure what is. And I'm not sure what's left of the approval requirement at that point. And the same thing holds for the annual payment determination, which also didn't follow. And that requires the employer to, I'm sorry, the plan to use the CVUs and the contribution rate at which the employer, quote, had an obligation to contribute. And again, that's not what was used here when determining withdrawal liability. And we're not saying that can't be done, but it has to be done with PVGC approval. And I think why that's important is because the PVGC is there, as it's set forth in the statute and in the regulation, to make sure that if you have these side agreements, that they aren't messing with the system. I mean, that's that's... I wouldn't say messing with the system, though. The agreement said, for a period of time, we're going to contribute an X amount. And in the period, then it said that if something happens, the withdrawal liability amount will be what it used to be. Nothing has really changed in the plan. It simply sort of changed when the payments are being... Almost like a balloon payment, is the best way I can think of it. It's like that there was an agreement to a balloon payment. It's not changing what was owed. You got... The yellow got temporary dispensation to allow it to try to financially rehabilitate. With the understanding that should this not work, we can't let the employees and benefit shares of this plan suffer. As a result, you're going to have to pay that which you have always owed. We just gave you a payment plan. Why can't we review it like that? Well, I guess two responses. One specific to this and one more general. One on specific to this. I don't know if, quote, taking the can down the road is necessarily something that's good for the system because you never know if an employer is or a plan, if they are going to go belly up. I mean, obviously, there's been a number of issues in this sphere. Whether it's good for the system or not, why isn't that precisely what happened? Well, I think to me, that goes to my second more general point, which is you can imagine the mischief that could occur if all of these side agreements can take place without PBGC approval. And I'll give you an example from this specific case, which is that my friends on the other side point to Appendix 143, and they point to language that says if there's a temporary termination or cessation of the employer's contributions shall be imputed for that period, which shall be treated as contributions required to be made before Schedule C. So now we have a situation where a plan is saying, and there's an agreement, that literally no contributions can be made, but we're still going to count it as 100% towards withdrawal liability. And I think that that is an absolutely delusional thing to do. The fact that this answers Judge Schwartz's question is to, you get this benefit in 2013, and it's basically you pay some now, you may have to pay what you should have paid later if you're in default. So is that illegal without PBGC approval? If it was, why did you enter into the deal without getting PBGC approval? Well, Your Honor, number one, it's not our obligation to get PBGC approval. That is the plan's obligation. But you would think from your perspective, if you got a benefit in 2013, which carried on for a number of years, wouldn't you want to have the support of PBGC approval if you somehow think that perhaps it's illegal if you don't get that approval? Your Honor, I don't think I dispute that someone should have sought PBGC approval, but the plan was getting a benefit out of this as well. And the plan has the obligation under the statute to do that. And just to circle back, I don't think there's any authority in the statute to allow these side agreements that permit parties to violate this. So you're right, PBGC had to approve this and didn't. Contract's voided. We're going back to what you owed in 2013, pre-2013, right? No, Your Honor. I think we're not arguing. No one's arguing for rescission of the contract. All we're saying is that- You're just saying it's an unapproved contract. No, I know no one's asking for the equitable context of rescission. But the position you're advocating for is this didn't have PBGC approval. As a result, that should mean it's unenforceable. Then we go back to the way the plan existed, which was calculating based on pre-distress Schedule G numbers. So we can do the calculation. We end up back in the same place, no? Your Honor, actually, I take issue with the idea that what we're saying is that it's been unenforceable. What we're saying is what you have to do when calculating withdrawal liability, which is where we are now, is you have to use, quote, the contributions required to be made under the plan. The only part of this agreement is going to be okay without PBGC approval, wink, wink, but not the part that hits you on withdrawal liability, right? We're using what the statute requires, Your Honor. Statute requires under the presumptive method, which is what the plan is using and professes to be using, the contributions required to be made, the CBUs and the contribution rate that the employer had an obligation to contribute. If you don't want to do that, you have to get PBGC approval. That's what we follow the statute, and that's what the statute requires. And I haven't seen anything by my friends on the other side that takes a dispute with that, which is why I think they're arguing that there just wasn't any change in the first place. Now, we disagree with that, and I think that there are plenty of reasons for that laid out in our brief, but I think that when it comes to the actual does the statute even allow for this, I don't think it does. And to go back, I think Artistic Heartland is actually the best case on that. It actually contemplates that the parties do have to seek PBGC approval. Now, it said that we don't have to address this, but it certainly contemplated that that was the case if there was actually a change in the method. If there's the equivalent of a novation but not the equivalent of an elaboration, correct? I'm sorry, your honor? If there's the equivalent of a novation but not the equivalent of an elaboration. If you were to take the Seventh Circuit's elaboration-novation distinction, which, again, was addressing a different type of method that has a little bit more wiggle room, we would still say that this is a novation because, again, it's, quote, any other alternative method. I actually don't think the elaboration-novation distinction really even works with that statutory requirement, which is why it was dicta. But, you know, if you are looking at this text of the statute, which was said... Yeah, I mean, what you see in Artistic Heartland 1353 and 1354 essentially is a trying, Judge Easterbrook, trying to make sense out of what's being argued. And he's coming up with that particular method of analysis. Do you disagree with the method of analysis? I disagree that there is an elaboration-novation distinction when it comes to determining whether, under the presumptive method, there has been, quote, any other alternative method. I think that you look at the word any, and I think that you look at what the Supreme Court has said about the word any. I look at the fact that this isn't some small sort of ministerial miscalculation. This is what the statute requires. This isn't even a regulation. So your theme throughout is we made a deal in 2013 for my time, in this case, your time. We got the benefit of it. And when there was a condition that caused the monies or the amount that should be 100% liability comes into play, that is, you go into bankruptcy, forget about it because it was illegal to begin with. It really goes back to Judge Schwartz's question, right? That's your theme. Our theme is that you follow the statute, Your Honor, and what the statute requires. But following the statute means-is what she said and what I just said incorrect? I don't-if that means following the statute, then I think you are- So then you should never have gotten the benefit for nine or ten years of the deal that you cut in 2013. No, I don't disagree with that because, again, I think we're saying-all we're saying is that this agreement to be held to Schedule G is-it is an agreement that exists and on its face is enforceable. But then you have to-when you are actually calculating the withdrawal liability, when it comes time to do that, and that's what the statute lays out in 1391, when you do that, you have to follow one of four laid out methods or you have to get permission from the PBGC to do something different when that time comes and that time came. And, you know, I don't-and I think that that's why you are seeing the arguments by the other side that really not defending the Bankruptcy Court's decision in reliance on artistic argument and instead saying, well, this didn't even need any approval in the first place because it didn't rise to that level. We disagree with that because if you're violating the statute, I don't-I think it doesn't get more straightforward that you need PBGC approval at that point, which is, again, the entire reason why you have that approval requirement in the first place. We're not saying you can't do these things. You just have to get the agency's approval, which is exactly what is required in the statute. Okay. We'll see you back at the bottom of the bottle. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Brad Berliner on behalf of Central State Southeast and Southwest Areas Pension Fund. Your Honor, part of the problem-Your Honors, part of the problems with-part of the problem with appellants' perspective when they look at the conditions upon multi-employer plans is that they're viewing this as a-the special financial assistance as a windfall to the plan. But that really miscomprehends the nature of multi-employer plans in general. The plans are not-for-profit trusts that operate exclusively for the participants and beneficiaries. And in that sense, they preserve and protect the assets for the benefit of the participants and beneficiaries. And that's how this needs to be viewed. Just as in 1382, 29 U.S.C. 1382 and 29 U.S.C. 1399, these are commands to the pension funds on behalf of their participants and beneficiaries to collect, to determine withdrawal liability, to send the employer a notice in demand, and to do so as soon as practicable. And if the plan doesn't do that, it's not acting in its fiduciary capacity. So it's your view these are conditions on the plan, these regulations, not on the employer, am I right? Correct. What is the Article I power the Congress used to authorize the statutes that allowed the PBGC to promulgate these regulations? The briefing had spending clause conversations. There's also the necessary and proper clause. What is your position on that point? The appellants have acknowledged that Congress has the authority under the necessary and proper clause to enact conditions related to money that they've appropriated. And so, in fact, in their brief, they've acknowledged that Congress can condition the receipt of federal funds on them being used as Congress designates. Well, Congress did exactly that in 1432. Congress said that these special financial assistance funds can be used to pay plan benefits and plan expenses. Now, my colleagues on the other side would say, well, no, Congress said may not shall. But, of course, there's the option that these multi-employer plans can first use whatever funds they have remaining before receiving special financial assistance to pay plan benefits and plan expenses and hold on to that special financial assistance. The corollary is not that, oh, you can use some of this money for the benefit of employers. That's just not how the statute is read. In fact, appellants consistently talk about appellant's rights but – excuse me, employer's rights under the statute. But as we've seen in that – But I think what they're saying – see if you agree – the calculation of withdrawal liability is a statutory matter. Do you agree with that? The calculation of withdrawal liability is a statutory command. And then they're claiming that the PBGC, in effect, amended the statute. And you can't do that. Do you agree with that? No, I do not.  Because all the PBGC has done is say with respect to a very unique situation, Congress providing special financial assistance to these severely underfunded and sometimes insolvent multi-employer plans that you cannot – you have to phase in that special financial assistance. They haven't changed the formula for calculating withdrawal liability. But to be clear, the PBGC has always had that authority under 1393 to implement methods, actuarial assumptions and methods. And whereas the courts have – and whereas 1393 makes clear that when the plan's actuary comes up with these actuarial assumptions and methods, they have to be reasonable in the aggregate. No such reasonable modifier is applied to the PBGC's actuarial assumptions and methods. And really, they've always had that authority. That authority was amplified or that authority was extended in 1432 when Congress said we're going to give – the corporation has to give special financial assistance to the funds and the funds can use the money for paying benefits and plan expenses. I just want to be clear on my understanding. As I understand it, they say there was a way to calculate withdrawal liability. There was an understanding of how you define plan assets. The PBGC regulations fundamentally change how you define assets. Do you agree with that? I don't agree with that because actually it's never been plan assets that's been – there's no definition of plan assets. It's actually – the statute talks about the value of plan assets. And there are two ways to calculate the value of plan assets. One, the plan actuary does that. And two, the PBGC can do that. Would you agree that before these regulations or absent these regulations, this money would be considered a plan asset? Well, I don't think anyone's disputing that the special financial assistance is a plan asset. But you dispute that the definition, if you will, and I recognize it's not specifically defined as you're saying, but you dispute that the definition is changed for plan assets? The PBGC could always, even under their existing powers, under 1302, the PBGC has always had the authority to further the purpose of NEPA, to discourage withdrawals. And in doing so, they were given the power to implement regulation in 1302b3 to further the statutory purpose. And then in 1393, the PBGC was given the authority to implement actuarial assumptions and methods that are separate from what a plan actuary may determine is reasonable. So in this instance, are you saying that the regulation is consistent with 1393 because allows an actuarial assumption such as the value of a particular asset to be part of the calculation? So you're saying that's the authority to, while the funds might be an asset on your books for general accounting purposes, is it your position that 1393, because the PBGC is given by Congress, this authority on actuarial assumptions could enact a regulation that tells it how to value a particular plan asset, in this instance, the SFA fund? That's correct. That's correct. And to be clear here, there's not a single employer whose withdrawal liability will be increased as a result of the special financial assistance. At most, it will stay the same. For the vast majority of employers, their withdrawal liability will actually decrease as the special financial assistance is phased in. I see my time is up. Before you sit down, just one quick question on the 20-year cap waiver. Do you understand any party to be challenging that bankruptcy court ruling that the 20-year cap applies even if withdrawal liability is accelerated? Yes, I do. So in two of the eight briefs, and only almost obliquely. I'm sorry, I didn't hear. I didn't see it argued in any brief, but for two of the eight that were filed, that somehow, is there a challenge to the 20-year cap waiver? Your Honor, because of the procedural issues in the case, the pension funds believe that issue is preserved because of the fact that you can't, the only reason to ignore the 20-year limitation on payments would be if there is a default. Upon reconsideration, the bankruptcy court, after first determining that there was a default and saying the 20-year limitation did apply, the bankruptcy court issued an amended opinion in which it said, wait a minute, there is not a default. And given the bankruptcy court's determination, there wasn't a default because why? The bankruptcy court determined that there wasn't a default, one, because the primary issue appears to be that the court determined that none of the plans had approved and issued their withdrawal liability assessments prior to Yellow having filed for bankruptcy. Of course, the plans disputed the determination. The bankruptcy court also appeared to determine that the bankruptcy in and of itself would not have triggered the default mechanisms, notwithstanding 29 U.S.C. 1399 C-5. Of course, it's the plan's position that indeed there was a default for multiple reasons, including because the plans were insecure as Congress envisioned under 1399 C-5. And in particular, central states, as it stands, had already made the determination that debtors were in default before, excuse me, I should say Yellow was in default before Yellow even filed for bankruptcy. However, because central states next board of trustees meeting wasn't until right after Yellow filed for bankruptcy, it actually wasn't approved until after the bankruptcy filing. But it is our position that there was a default, but that issue has not been, that issue has not yet been finalized. So is the 20-year cap issue currently before us? It is not. It has not yet been finally decided. The default issue has not been finally decided and rendered to an appealable order by the bankruptcy court. So the 20-year cap waiver issue is not before us? Correct. Okay, that's all I need to know. Thank you very much, counsel. Thank you, your honors. Good morning, your honors, and may it please the court. My name is Andrew Phillip Walker, appearing on behalf of the Pension Benefit Guarantee Corporation. To start, I just want to say that we agree with the arguments raised by Mr. Berliner, and I'd like to emphasize a point in particular, though. And that is that when Congress acted to assist struggling multi-employer pension plans, it didn't simply open the treasury doors, start writing the checks, and then throw up its hands and say, whatever happens to this money happens. Rather, at the same time Congress authorized SFA funds to go to multi-employer plans, it also gave specific instructions concerning these funds in 1432. What statute? So 1432 is your statute, or is it also 1302? Well, 1302 is Congress's general delegation of authority in ERISA for PBGC to make regulations. And that was also, we argue, authorizes the rule. We think Congress specifically spoke to PBGC and specifically delegated authority, was more specific in delegating authority to regulate SFA funds in 1432M. And what was the Article I authority Congress was relying on to authorize that statute, to authorize the PBGC to act? I ask this only because there was a lot of briefing on what constitutional provision in Article I we're going to rely on here. So what do you say it is? I think to take a step, if it's okay to take a step back, as to why there was a lot of constitutional authority. I don't believe Appley's raised a challenge to the constitutionality of it, but rather the constitutional precedent was used below it by Judge Goldblatt to speak to an issue of statutory interpretation. And I think your adversaries, I understood, were trying to use it to suggest that it, that Congress couldn't allow some event to impact a third party, i.e., you know, and as a result, there seems to be a little dispute. So I just want to know from the PBGC's perspective, what does the Article I power relied on? Spending clause, necessary and proper? We think that Congress had authority under both the spending clause and necessary and proper clause. Judge Goldblatt below was looking on that term condition specifically. Under spending clause authority, a condition can only be on a fund recipient. We do think his analysis there was correct. Appley's looked at cases in black letter law concerning necessary and proper authority, but which doesn't speak specifically to the spending clause cases that Judge Goldblatt himself relied on, Philpott and others. Justice Alito recently summarizing Philpott. I'm going to loosely or closely paraphrase, right? So Philpott and other such cases stand, he identifies them as spending clause cases and says they stand for the proposition to the federal, they support the federal government's ability to protect federal monies from being used for purposes other than those intended by Congress. So that protective purpose over the funds, even if that condition is on a fund recipient, can operate to stop funds from misuse. What I would also say here is that we fully support, and I'm happy to answer further questions on Sabri, Philpott and other cases. And the best argument that this is indeed a condition on the fund pursuant to the statutory language is the most straightforward one, right? Which is that the text of the regulation itself is directed towards the funds. It's asking the funds to do a particular calculation. And this isn't just some cute workaround. This is consistent with the structure laid out in ERISA itself. 1382, Congress tasks the funds with preparing the calculations, selecting the monies. And if you think it's so clear then, do you agree that we don't even need to turn to the major questions doctrine because that's a tool of statutory construction and if there's clarity, no need to go there. Yes, absolutely. And I think the facts of those cases make that abundantly clear. Things like, you know, student loan forgiveness affecting a third of discretionary funding, major political questions that have been debated for decades, elephants and mussels. No, I think here when Congress acted to delegate authority, it did so at the same time it introduced these funds and it did so specifying with, you know, it says withdrawal liability specifically in the statute. I think Congress also, again, was clear about its purpose for these funds in 1432L, right? Specifies there to pay benefits and expenses. And not just in 1432L, the 1432J1 also kind of gives the period of time that these funds are for through 2051. Is the calculation of withdrawal liability a statutory matter? Your Honor, I believe it's made with reference to the statute. But I think an important point is that that statute needs to be constructed consistent with Congress's more specific instructions in 1432. There's been argument over the term of assets here, right? Or discussion, that's flagged. And Mr. Berliner correctly identified that valuation of the assets is kind of the central issue here. PBGC has argued and stands by its argument that in a vacuum, its regulation is consistent with 1393C. But we're not in a vacuum. We're in a world where when Congress introduced these funds, it also spoke in 1432L, 1432J1, and it explicitly delegated PBGC authority in 1432M to regulate SFA funds with respect to withdrawal liability. What is a plan asset? A plan asset, it's something of value to the plan. But when Congress passed MEPA, it was not anticipating the introduction of something like SFA funds. Taxpayer money is paid in a lump sum in order to provide benefits through 2051. And so, again, PBGC's regulation values SFA funds over time. It tends to provide, or it does provide an accurate and reasonable reflection over the period of which SFA is likely to be spent down by the plans. But PBGC's regulation also furthers Congress's purpose. Looking to the language from Brown and Williamson, which Judge Goldblatt quoted below, again, closely paraphrasing here, the specific policy embedded in a later statute necessarily controls the construction of an earlier statute, even when that earlier statute hasn't been expressly amended. And so we think the application of 1393C here to bar PBGC's regulation would be inconsistent with Congress's more specific language in 1432. It's not a chain of command issue. It's Congress speaking generally, and then Congress speaking later and more specifically. Basic principles of statutory interpretation then weigh against applying 1393C in the manner argued for by appellants today. So, Tamara asked you about calculations. So, I'm going to ask you about 1391 and the fact that there are purportedly four formulas that are to be applied. Pick one. Make sure you comply with it unless you have approval from the PBGC. Yes. So, and this goes to the additional briefing. So, I should say as to that, PBGC doesn't consider itself a party to that. I'm aware of that, but you are the PBGC. I'm standing up here today. I am prepared to speak, but we might hit up against the limits of my knowledge here, and I'd like to offer that we are happy to file an amicus brief if it's helpful. The PBGC stands behind its opinion expressed in Opinion Letter 89-8 because a plan and employer are free to contract for modification of the plan's regular statutory method for allocating UVBs that allegates more UVBs to an employer if it withdraws. PBGC is not—approval is not required in those instances. The purpose of the requirement of PBGC approval is as reflected in the statute to ensure that a plan does not adopt an alternative allocation method that would significantly increase the risk of loss to plan participants and beneficiaries for the corporation. So, would the argument then be here that you don't need PBGC approval because it's not an increase, but it's a decrease in liability? I believe that that is the opinion endorsed by the Opinion Letter. I am not attempting to make an argument that goes beyond that, though. Although, again, I would be happy to provide further briefing. I don't think I'm following you. You're saying that—I know you're not in a position to opine on any particular specific agreement, but pretend it's a hypothetical. There's an agreement to modify a contribution rate during a particular period of time that's less than what would otherwise be owed for whatever reason. But let's say it's to enable the employer to have a moment to kind of catch its breath because maybe it's under some financial distress. And so the parties agree that the actual rate of contribution during that period will be less than what it had been, with the understanding that if there is a withdrawal, the rate for calculation purposes would be that which existed before this financial benefit was given. Is that permissible without PBGC approval? Because it's not increasing the amount of contribution due, or liability, rather the liability amount, but rather ensuring the amount due is actually paid. Can you say that last phrase, sorry? Is it to ensure that the amount actually due is actually paid as the withdrawal liability? Because you said something in response— I'll tell you why I'm asking this. You said something in response to Judge Ambrose about if there's a decrease in liability. If there's an allocation in more, rather, more UVBs to the employer if it withdraws. Your Honor, my impulse is to say yes to your hypothetical, but I can't answer that question authoritatively today. Would it be worth giving us a supplementary memo on your position on this? We would be happy to provide that. Whatever the panel would like. Okay, well, we're going to give me a moment just to ask you a different question, just to see if that should also be it. Let's assume there is an agreement the parties entered that lacked PBGC approval. And what would be the consequence of that? I would assume it's not enforceable if it requires approval. Am I correct? If it required approval, I think this, again, would be preliminary thoughts and better addressed in the memo itself. I think that if the statute airtight required approval, then the statute would need to be enforced. The opinion you cite, 89-8, is that the one that Judge Easterbrook relied on at Narcissistic Heart? I don't recall, Your Honor. You might want to include that in your memo. Yes. Okay, this is the plan, so everybody gets a chance to be heard. We'd ask that within 10 days of today, the PBGC give us... Better make it Friday as opposed to Saturday. Oops. What would that make it? On Monday. Make it, okay. How are we feeling about July? Let's go with, I know that July 8th is a Tuesday. We're going to go with July 8th. By July 8th, if you could give us a submission not to exceed 2,500 words on the issues that we've just discussed. Limited to that. We'll give anybody else who wants to be heard. 10 days later to respond, that's July 18th. Try to coordinate your letters so we don't get more than one from everybody. For those who are on the side of the police, if you want to just say, me too, we're good. Don't feel the need to respond in a duplicative fashion. We will tell you if we need replies, okay? Thank you. Let me just see if Judge Montgomery, is there any questions for the person? July 8th works because he doesn't want to file anything on July 4th anyway. Well, I wouldn't want him to do that. We've got a birthday party to celebrate. For the USA. All right. Anything further, Judge Ambrose, for counsel? All right, you can be seated. Thank you. Good morning. I'm in the police court. Edward Meehan from the Groom Law Group here on behalf of the New York State Teamsters Pension and Conference Fund on what MFN's counsel called the contract issue. To be clear about one thing, I am not here representing the Western Pennsylvania Teamsters. At one time, they were in our group at MFN in the aftermarket, acquired that claim. Hopefully now this won't be a little, after the reference to the briefing, this won't be a little bit in the sense of academic, but I do have a few points that it would be helpful, I think, for the court to consider before we get that additional briefing. It is appropriate to consider this a contract issue. There was no focus whatsoever in the briefing that came from the appellant, but we did point out some factual background material to which they've never responded, which is probably helpful to keep in mind here. This was a contract that was heavily negotiated. It was negotiated between a very sophisticated employer, one of the largest trucking companies in the country at that time, who was seeking to avoid filing for bankruptcy and being concerned it would have to go out of business at that time, because it was able to enter into the agreement with the New York State Teamsters Fund and some other funds. It was able to avoid liquidating well over a decade ago, and they've received all the benefits of remaining in business during that time. And it was negotiated by that trucking company by the partner of the individual who's representing the debtors here today, very sophisticated. Even if that's the case, though, there's still the statutory language that says when we're calculating withdrawal liability, it shall be calculated consistent with what the provision, in this case, the presumptive method states. So whether it was agreed to or not, you still have to propose upon that, especially as a plan, these obligations under ERISA, correct? Yes, except to the extent that the parties are always free to enter into a contract that is not inconsistent, and by inconsistent, does not undermine the purposes of the statute. The statute has many purposes, including to protect other employers so that other employers don't have to pick up the excess liability that would otherwise go unpaid. And in this context, the trustees of the New York State Teamsters Fund were faced with a situation where their second largest employer in the fund was facing, by their own position, going out of business. It was in the interest of the fund to try to help them preserve their business. It was also very directly in the interest of the employer. As some of the questions earlier pointed out, it really was a question of now having obtained all those benefits for well over a decade, the employer wants to come in and spurn the obligation that it has. How is the method of calculating liability if the contract exists different from if it didn't exist when we have this statute? In this case, we don't view it as a change in the method at all. The New York State Teamsters Fund has always used the presumptive method. It continues to use the presumptive method. We do view this, consistent with some of the comment earlier, as really, I'd put it as a tweak. It is a data input. And it is very specific in Schedule G of the agreement here, which was signed by Yellow, that in the event of a later withdrawal, which has happened now, that the required contribution is the contribution rates that were paid prior to the entry of the state. Was there a discussion in 2013, to the extent you know, was there a discussion in 2013 of attempting to get PPGC approval? There was no discussion whatsoever. And in fact, there was a deposition that was taken of the Kirkland partner who led this restructuring. And that's at the supplemental appendix in the case. With at 157 to 58, there are some excerpts where I deposed her. And she acknowledged that at the time, she viewed the agreement as binding. She represented it to the council for the New York State Teamsters as being binding. She's never retracted that. Her knowledge, no one ever has. So there was a very clear understanding between the parties that what they were negotiating would benefit both, would hopefully preserve Yellow from filing for bankruptcy and going out of business, which it accomplished for this long period of time. And no discussion about it had to be conditioned upon anything. It was in the words of council, in writing and under oath recently, reaffirming it, binding. Data input. You use that language, data input. The presumptive method applies. It only tweaks, quote, the data input. Is it fair to say that that's what the plan and an employer does is they come up with data inputs, like what's the dollar amount? What's the CBU? And all this does is just change. That's not changing the method of calculation. I understand your argument.  Okay, great. Let me just see if my colleagues have any further questions. Okay. Thank you for your argument. Thank you very much. Is there a council on the bottom? Thank you, your honors. Hello again. Judge Montgomery-Reeves, you were going through our thesis as to what you have with 1391 and 1393. A clear congressional command for withdrawal liability relative to employers and how that is to be calculated. And I really don't think that there's much denying. No one does seem to deny that plan assets need to be part of that equation. They need to be subtracted from the non-forfeitable benefits. That's how you arrive at the correct answer. Nor is there any dispute that when we talk about SFA funds, billions of dollars of them, those are plan assets by any fair, objective measure. Thus, our straightforward statutory argument that that congressional command specifically operating as to employers and their bottom line liability cannot be altered under auspices of reasonable agency regulation imposing a reasonable condition on the plans. That's our argument. And I think you have it from Congress as well as from us. Now, there is acknowledged agency discretion judge courts to decide what are reasonable actuarial assumptions that go into this. That's on the margins. That's interstitial. And it's driving at what is the correct calculation of plan assets. There's no categorical disregard of acknowledged plan assets that operate there. And I would convince your honors the concrete pipe decision of the U.S. Supreme Court at 508 U.S. at 50910. We cite that in our reply. And what the court observed there is that the assumptions are used to objectively calculate the value of assets and liabilities to determine the present value of the plan's liability for vested benefits. It sounds like a pretty objective calculation. You got a chunk of money. The regulation says it can be X dollar amount, however you would calculate that. If certain events happen during certain years, how far you're out from receiving the funds. It's objective. There's no subjective valuation like, oh, that's such a wonderful portrait of Judge Garth. It's priceless to me. But that's not what's going on here. Judge Garth is the gentleman in the middle. And he was from New Jersey. And he's at my court. It's a wonderful portrait. You have my subjective opinion on that. But I would respectfully submit the opposite of what Your Honor just said. When you have a categorical exclusion from the equation of acknowledged billions of dollars in monies appropriated from the U.S. Treasury, the U.S. government is good for it. And it's to be paid in a single lump sum right at the outset to say that that is worth zero dollars. Zero dollars on day one is not objective. That is not reasonable. That is not what any actuary would do valuing any other plan asset that is on the sheet. And that kind of begs the question that I asked earlier of you. Do the regulations increase the amount of your withdrawal liability or merely hold it to what it was before the ARPA funds came in? Well, Judge Ambrose, I think if we take the moment in time when Congress passed the statutory authorization for the SFA funds, it increases because they did that against the backdrop of what you have in 1391 and 1393 that said that plan assets, all plan assets, would be factored into the calculation of employer withdrawal liability. So the agency, relative to what Congress did, has massively increased employers' withdrawal liability. And it's no different, Judge Fords, than if the agency had said objectively, just add a billion dollars, just add a billion dollars to what is the amount of unfunded vested benefits that factor into the employer's withdrawal liability. That might be in some sense objective, but it's not an objective or reasonable actuarial assumption that reflects fidelity to the congressionally prescribed statutory formula. And I'd also comment, Your Honor, Maybe the analogy might be, let's say, a bond coupon. If a bond coupon is expired, is the item more expensive? Or is it just to pay it off is full price, doesn't increase, just you go back to paying full price? Judge Ambrose, I don't think that that's the analog, because, of course, the terms of it would be there from Congress in issuing, I think what you're saying is the bond. I don't think an agency would be able to change that. But I also think that this is an easier case, because the agency has said, pursuant to its exercise of rulemaking authority, it is not valued as a planned asset on day one. You can have all sorts of different views of how you value it, for purposes of the overall equation. But what you cannot do is say it's excluded from the equation and or there'll be some phase in that is divorced from the actual present value of the money. And just the MCI and EPA cases, MCI is 512 U.S. 218, the EPA case 373 U.S. 302. Those were addressing FCC and EPA regulations that one under auspices of modifying a statutory framework fundamentally altered it. Supreme Court said you cannot do that. The same thing for EPA, where you had a specified statutory threshold and the agency massively changed that under auspices of its rulemaking discretion. Those things were contravening statutes. That's what you have here. There's one other question from the court that I would like to address, which is, so then what is the reasonable condition on a plan relating to withdrawal liability that we acknowledge the agency has statutory authorization to promulgate? And there are plenty of those. One of them is what you have as far as approval of settlement of employer withdrawal liability, if that relates, and that's operating against the plans. Another is the actuarial assumptions that we were discussing, just kind of on the margins of how exactly these actuarial assumptions get applied. It's not a categorical exclusion, the likes of which you have here. And last, plans have discretion about employer withdrawal liability on the margins. What's called a de minimis exception that may be raised if an employer owes between $50,000 and $100,000, the plan may decide to forgive that, subject to its exercise of statutory discretion. And another is basically, if the employer's tenure is less than five years, then the agency can forgive withdrawal liability. You could have reasonable regulations that attach to SFA funds that say, okay, plans, you're not going to offer that sort of forgiveness to employers. The withdrawal liability will be calculated irrespective of that. That would all be fine and fair, Your Honors. What you can't have is disregard of plan assets that belong in the statutory equation. That's our respectful submissions, Your Honors. Thank you very much, Counsel. Thank you, Your Honor. Just a few points in rebuttal. Number one, in response to Judge Schwartz's questions to both PBGC Council and the New York Teamsters Council about whether ultimately if PBGC approval was required, I believe they both ultimately answered, yes, PBGC approval would be required if there was a change in method. PBGC Council said, well, I'm not sure if there's a change in method, and I guess we'll have some briefing about that. New York Teamsters Council said, if it's not in, yes, but only if it's not inconsistent. And I think that what we have here is an inconsistent situation because you have any other alternative method when you have contributions required to be made and when calculating withdrawal liability, they were not using contributions required to be made. The second point- Whatever they submit by the 8th, you've got until the 18th to reply to it. But I think the PBGC Council did want more time in order to assess the issue. But I'm not so sure that what you're saying is directly contradictory to what the New York Teamsters Council said. Well, I think that in the end, Your Honor, I think everyone recognizes that at some point, PBGC approval is required in some way. And I want to make clear as another one- Not so sure that's what they said. Yeah, I'm not so sure either. Well, I guess I would make the point then that our position is actually the narrow position and it's the pro-beneficiary and pro-PBGC position. When you calculate withdrawal liability, you have to follow one of the four statutory methods or else get PBGC approval. And you can do that for private agreements for different methods, but the plan still has to get PBGC approval in order to ensure against the risk of something going wrong, which is exactly why- I keep coming back to the question asked before. Somebody on the other side says, wait a minute. Heads, I get an advantage. Tails, I get no disadvantage. Your response is? Well, Your Honor, number one, I want to point out that the statute actually provides a 29 USC 1085E1B that there can be alternative contribution structures. So as a matter of contract, it's OK to have an alternative contribution structure in a distressed situation. But I don't think it's a situation where, I mean, parties can agree privately to- I mean, parties can agree privately to say that if we have any dispute, we're going to take it directly to the Third Circuit. But that doesn't mean that when the time comes, they can take it directly to the Third Circuit. The statute says you can't do that. You don't have jurisdiction. So it doesn't just mean that any time you've got an agreement, whatever the benefits or the costs to each side might have been, that you can simply ignore what the statute expresses. Any discussions you know of in 2013 on your side to getting PBGC approval? I am not aware of anything in the record about our asking or checking about whether PBGC approval is required. That is the plan's responsibility and the plan's obligation under the statute. Thank you, Your Honor. We thank everybody, and there are teams for all the work that went in to this case. The court will take the matter under advisement. We would like the parties to split the cost of a transcript of this oral argument so the sides could split that. And I'm just going to repeat the deadlines because I do want to have a time of day also. So by July 8th, the PBGC will submit its brief not to exceed 2,500 words. By noon, we'd like it submitted. And then the response, anybody who wants to respond, no greater than 2,500 words per response, also due July 18th at noon. We really ask counsel to coordinate so that we can avoid redundant briefing on the issues. So with that in mind, this panel is going to take a quick break, and we will be back for another case shortly.